# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | CRIMINAL NO. |
| v. | § | 3:15-CR-00498-K |
| | § | |
| COREY JEVON BELL, | § | |
| | § | |
| Defendant. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is Defendant Corey Jevon Bell's Motion to Suppress (the "Motion") (Doc. No. 135). The Court held a hearing on the Motion on April 3, 2019. As the Court noted in its minute entry for the hearing (Doc. No. 157), its order was forthcoming. After considering the Motion, the response to the Motion, the arguments and evidence presented at the suppression hearing, and the applicable law, the Court **GRANTS** the Motion. The good-faith exception does not apply to the officers' search of 206 W. Laureland Road because the affidavit supporting the relevant warrant was so lacking in indicia of probable cause to provide the basis for a normal inference that a nexus existed between the defendant's drug trafficking and the 206 W. Laureland Road residence, and probable cause to support the warrant did not exist because no additional evidence outside of the affidavit supported the probable cause determination. Therefore, the evidence recovered from that search will be suppressed.

## I.     Factual and Procedural Background

The Motion in this case seeks to suppress evidence recovered from a residence located at 206 W. Laureland Road (the "Laureland Residence") on the basis that the search violated the Fourth Amendment. The evidence recovered from the property included controlled substances, drug paraphernalia, and a 20-gauge shotgun. For purposes of this Motion, the government and Defendant Corey Jevon Bell ("Bell") do not dispute any of the material facts; rather, the parties dispute whether the search of the Laureland Residence violated the Fourth Amendment and if the good-faith exception should nonetheless apply. The Court addresses the investigation into Bell to the extent it provides helpful context for the arguments presented by the parties concerning the Motion.

In 2015, the Dallas Police Department investigated Bell and his co-defendant girlfriend, Amber Faith Pavatt ("Pavatt"), on a suspicion of drug trafficking. Detective Dustin Kelly ("Detective Kelly"), an undercover narcotics detective at the time, was one of the officers investigating Bell and Pavatt. In the course of his undercover work, Detective Kelly completed three separate drug transactions for methamphetamine with Bell. The first transaction occurred on May 20, 2015, and both Bell and Pavatt arrived at the location of the transaction in a silver Pontiac G6 vehicle. The second transaction occurred on June 25, 2015, and both Bell and Pavatt arrived at the location of the transaction in a maroon Cadillac vehicle. At some point during his investigation, Detective Kelly determined the identity of both Bell and Pavatt through open internet

sources. Detective Kelly also alleges that he determined that Bell had a last known address of 206 W. Laureland Road through police arrest records.

The third drug transaction occurred on August 5, 2015. Detective Kelly arranged a drug transaction with Bell for August 5, 2015. After arranging the transaction, undercover officers went to the Laureland Residence to conduct surveillance. At approximately 4:20 P.M., the undercover officers observed a maroon Cadillac arrive at the Laureland Residence, and an individual fitting Bell's description exited the Cadillac and entered the Laureland Residence. Detective Kelly arrived at the arranged meet location for the drug transaction at approximately 5:15 P.M. and contacted Bell over the phone to let Bell know that Detective Kelly was at the meet location. The individual fitting Bell's description left the Laureland Residence shortly after the time of the call and drove the silver Pontiac vehicle to the meet location. The surveilling undercover detectives observed the individual in the silver Pontiac travel to the meet location. Upon arriving at the meet location, Bell called Detective Kelly, met Detective Kelly in Detective Kelly's car, and completed a transaction for methamphetamine. When Bell left the meet location after the transaction, officers pulled Bell over and arrested him. Detective Kelly performed a field test on the suspected methamphetamine and confirmed that it was indeed methamphetamine.

After the arrest of Bell, Detective Kelly drafted an application for a search warrant for the Laureland Residence. In his affidavit, Detective Kelly asserted that based on his "training, experience, and [his] participation in [the] investigation and

other investigations involving drug trafficking," individuals that traffic narcotics often keep other evidence relevant to drug trafficking within their residences. Detective Kelly further swears the following facts relevant to his investigation of Bell in the affidavit for the search warrant:

I, the Affiant, am conducting a narcotics investigation for the purchase of Methamphetamine which involves Suspect #1 and Suspect #2 who are described in paragraph #2 over the course of the past 4 months of 2015. I was introduced to Suspect Corey Bell and Amber Pavitt [sic] on 5/20/2015 at which time I conducted a narcotics transaction for 3.4 grams of Methamphetamine. This transaction was documented on case number 113877-2015. During this transaction I observed Suspect #1 and Suspect #2 arrive at the meet location inside a silver Pontiac G6 Texas License plate FNJ9140. On 6/25/2015 I again met Suspect #1 and conducted a narcotics transaction for the purchase of 3.3 grams of Methamphetamine which was documented on case number 145076-2015. During this transaction I observed Suspect #1 and Suspect #2 arrive at the meet location together inside of a Maroon Cadillac Texas License Plate FBG7312. During the course of my investigation I discovered the identity of both Suspect #1 and Suspect #2 through open internet sources that not only contained the names of the suspects but also photos of them together. I also discovered through police arrest records that Suspect #1 was presenting a last known address of 206 W. Laureland Road.

Upon discovering this location was the residence for Suspect #1 I traveled to this location where I observed both the Silver Pontiac and the Cadillac parked in front of the residence that is described in Paragraph #1. On 8/05/2015 I and Suspect #1 [sic] arranged to meet and conduct a narcotics transaction for the purchase of 7 grams of Methamphetamine. After arranging this transaction, undercover narcotic detectives were sent to area [sic] surrounding 206 W. Laureland Road in order to conduct surveillance on that location. At approximately 4:20 PM unmarked units observed a Maroon in color Cadillac arrive at 206 W. Laureland and a B/M fitting the suspect's description get out of the vehicle and enter the front door of the residence where he stayed. Upon arriving approximately [sic] 5:15 PM at the meet location, which was scheduled to be at the McDonalds parking lot that is located at 125 W. Camp wisdom Road,

4

Dallas, Dallas County Texas, I made contact with Suspect #1 via phone and stated that I was at the meet location. Suspect #1 stated that he was around the corner and would arrive shortly. Shortly after this phone call Detectives observed a B/M fitting Suspect #1's description exit the front door of 206 W. Laureland, wearing a black t-shirt and red shorts, enter a silver Pontiac G6 and drive eastbound on Laureland to the IH 35 service road. At the service road Suspect #1 turned southbound and traveled to Camp Wisdom where he turned westbound and entered into the McDonalds parking lot. Since he exited the front door of 206 W. Laureland, undercover detectives never lost sight of Suspect #1, and Suspect #1 never stopped or went to any other locations except for the meet location. Upon arrival to the McDonalds parking lot, Suspect #1 got out of his vehicle, called me, looked around, and was directed to my vehicle. The suspect got into my vehicle through the passenger side door and sat in the passenger seat of my vehicle. At this time the suspect exchanged a clear plastic baggie that contained a white crystalline substance that I believed to be Methamphetamine for $175.00 US currency that was previously photographed to complete the narcotic transaction. After conducting the transaction Suspect #1 exited my vehicle and returned to the Pontiac G6. Suspect #1 left the location and was stopped and arrested for the drug transaction that had just occurred.

The drug evidence was weighed and processed at the Narcotics Division. Detective D. Fogle # 8704 conducted a presumptive field test of the suspected [sic] which yielded positive results for the presence of Methamphetamine witnessed by Sgt. P. Mora # 8705.

The weight of the Methamphetamine was 7.1 grams.

Bell argues in his Motion that probable cause to search the Laureland Residence did not exist and that an objective officer could not rely upon the warrant in good faith. Detective Kelly's testimony did not reflect that any additional evidence, other than the affidavit, was presented to Judge McDowell, the judge who reviewed and issued the warrant. Accordingly, facts outside of the affidavit in the application for the warrant are irrelevant for this Court's determination of the Motion; however, the Court

nevertheless details some other related facts, as presented in the hearing the Court held on the Motion, in an effort to provide a fuller context because, importantly, none of the facts detailed below were included in the affidavit.

At the hearing on the Motion, Detective Kelly testified that the Laureland Residence was in an area known for narcotics trafficking. Detective Kelly also testified that part of his desire for obtaining the warrant to search the Laureland Residence related to statements made by Bell that implied Bell had more methamphetamine that he could sell to Detective Kelly immediately.

During cross-examination, Detective Kelly testified that no transactions with Bell ever occurred at the Laureland Residence. Detective Kelly also testified that the address listed as Bell's residence on Bell's driver's license was not the Laureland Residence, and Bell's driver's license had been issued on June 15, 2015. The investigating officers only observed the Laureland Residence for part of one day, and during their observation, the officers never saw any indication that the Laureland Residence operated as a "trap house." Furthermore, the extent of the connection between Bell and the Laureland Residence that was known to the officers was the 55 minutes that officers observed Bell at the Laureland Residence immediately proceeding the August 5, 2015 drug transaction. Detecitve Kelly could not testify as to whether Bell carried anything into or out of the Laureland Residence, and the affidavit is silent as to whether the surveilling officers observed Bell with any objects entering or exiting the Laureland Residence.

## II. Applicable Law

Under the Fourth Amendment, "no [w]arrants shall issue, but upon probable cause." U.S. CONST. amend. IV. "Probable cause exists when under the 'totality of the circumstances . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Newman*, 472 F.3d 233, 237 (5th Cir. 2006) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). A warrant that issues without probable cause may violate the Fourth Amendment, but the violation of the Fourth Amendment does not necessitate the exclusion of the evidence obtained in the search. *United States v. Leon*, 468 U.S. 897, 906 (1984). The exclusionary rule instead "operates as 'a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved.'" *Id.* (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)).

The good-faith exception allows for the introduction of evidence that would otherwise be excluded under the exclusionary rule "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." *Id.* at 920. The good-faith exception will not apply, however, when:

> (1) the magistrate or judge who issued the warrant "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth"; (2) "the issuing magistrate wholly abandoned his judicial role"; (3) the officer relied on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) the warrant is "so facially deficient—i.e., in failing to particularize the place to be

searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid."

*United States v. Brown*, 567 F. App'x 272, 281 (5th Cir. 2014) (quoting *Leon*, 468 U.S. at 923 (citations omitted) (internal quotation marks omitted)). The Motion and Bell's arguments at the hearing focus on the third example for when the good-faith exception to the exclusionary rule does not apply.

An affidavit supporting a warrant that is "so lacking in indicia of probable cause" is often referred to as a "bare bones" affidavit. *United States v. Pope*, 467 F.3d 912, 920 (5th Cir. 2006). "'Bare bones' affidavits typically 'contain wholly conclusory statements, which lack the facts and circumstances from which a magistrate can independently determine probable cause.'" *Id.* (quoting *United States v. Satterwhite*, 980 F.2d 317, 321 (5th Cir. 1992)). "[E]xamples of 'bare bones' affidavits include those that merely state that the affiant 'has cause to suspect and does believe' or '[has] received reliable information from a credible person and [does] believe' that contraband is located on the premises." *Id.* (quoting *United States v. Brown*, 941 F.2d 1300, 1303 n.1 (5th Cir. 1991)).

"When considering a challenge to a search made pursuant to a warrant, this court employs a two-part test: 'First, the court determines whether the good-faith exception to the exclusionary rule applies; if it does not, it must ascertain whether the warrant was supported by probable cause.'" *United States v. Rojas Alvarez*, 451 F.3d 320,

329–30 (5th Cir. 2006) (quoting *United States v. Gibbs*, 421 F.3d 352, 355 (5th Cir. 2005)).

### III. Analysis

#### A. The Good-Faith Exception Does Not Apply Because the Affidavit in Support of the Warrant Was So Lacking in Indicia of Probable Cause Concerning the Nexus Between Bell's Drug Trafficking and the Laureland Residence.

The Court first addresses whether the good-faith exception to the exclusionary rule should apply to the officers' search of the Laureland Residence. The Court recognizes that the Fifth Circuit "has often found good-faith reliance on a warrant to search a defendant's home where the affiant alleged (1) the defendant's involvement in drug trafficking and (2) that—based on the affiant's law enforcement experience—such criminals keep drug paraphernalia at their homes." *United States v. Fields*, 380 F. App'x 400, 403 (5th Cir. 2010). Although an allegation "that—based on the affiant's law enforcement experience—[drug trafficking] criminals keep drug paraphernalia at their homes" on its face would appear conclusory, for purposes of the good-faith exception, the Fifth Circuit has found that good faith exists when this allegation is paired with non-conclusory facts about a suspect's drug trafficking. *Id.* at 403–04; *see United States v. Pickens*, Crim. No. 3:12–CR–356–D, 2013 WL 1155414, at *8 (N.D. Tex. Mar. 21, 2013) (Fitzwater, C.J.) (holding that "sufficient indicia of probable cause as to the location nexus" existed when officer inferred that drug-trafficking evidence might be at the suspect's residence).

The Court finds that this general observation of *Fields* does not apply to the instant case for two reasons. First, when the Fifth Circuit has "often" found that the good-faith exception applied to cases involving drug trafficking, the nature and extent of the suspected drug trafficking provided the basis for the normal inference that further evidence of drug trafficking would be in the suspect's residence. *See, e.g.*, *Fields*, 380 F. App'x at 403–04 ("The affidavit here recited that Tennessee had recently indicted [the defendant] on various drugs and weapons charges—reasonably leading [the affiant–officer] to believe probable cause existed that [the defendant] continues to be a drug dealer—and that, in [the affiant–officer's] extensive experience, jurisdiction-fleeing, gun-toting drug dealers keep evidence of crime in their homes." (footnotes omitted)); *United States v. Pofahl*, 990 F.2d 1456, 1476–77 (5th Cir. 1993) (explaining that an affidavit detailing the defendant's "involvement in a long-standing drug trafficking operation" involving large quantities of drugs, along with certain continued conduct at the defendant's new residence, was not a bare-bones affidavit); *United States v. Kleinebreil*, 966 F.2d 945, 947–49 (5th Cir. 1992) (describing the defendant's long-term involvement in a "marijuana organization" that involved moving bulk shipments of marijuana in rental cars from Austin, Texas to Atlanta, Georgia); *United States v. Webster*, 960 F.2d 1301, 1307 (5th Cir. 1992) ("[T]he basis for searching [the defendant's] residence was his overall drug trafficking and sales activity, not just those sales that actually took place at his residence."). Second, the general observation encapsulated in *Fields* has an implicit premise unaddressed by the case law of the Fifth

Circuit: The parties throughout the case law do not dispute whether the officers had probable cause (or sufficient indicia of probable cause for purposes of the good-faith exception) that the searched properties were in fact the suspects' residences, and therefore the courts have not addressed what the effect on the good-faith exception is if the allegations that the searched property is the suspect's residence are conclusory because the affiant–officer only refers to outside records concerning the suspect's residence that the issuing judge or magistrate does not review. *See e.g.*, *Brown*, 567 F. App'x at 275 (addressing the insufficient affidavit but proceeding on the premise that the searched property was the defendant's residence); *Fields*, 380 F. App'x at 404 (analyzing on the assumption that the searched property was in fact the defendant's home); *Pope*, 467 F.3d at 915, 920 (explaining the facts of the investigation and why the affidavit was not a "bare bones" affidavit, but providing no explanation as to how the officers knew a property was the defendant's residence); *Gibbs*, 421 F.3d at 354 (beginning the factual discussion with the implied understanding that the officers "executed a search warrant for drugs and other paraphernalia at [the defendant's] residence").

The Court turns first to the issue of the affidavit's facts concerning Bell's drug-trafficking activity. When a warrant to search a suspect's residence depends upon criminal activity that did not necessarily occur at the suspect's residence, "[f]acts in the affidavit must establish a nexus between the house to be searched and the evidence sought." *United States v. Payne*, 341 F.3d 393, 400 (5th Cir. 2003) (citing *United States*

11

*v. Freeman*, 685 F.2d 942, 949 (5th Cir. 1982)). "The nexus may be established through direct observation or through 'normal inferences as to where the articles sought would be located.'" *Id.* (quoting *Freeman*, 685 F.2d at 949).

The Fifth Circuit's observation in *Fields* about how the good-faith exception "often" applies for searches of residences of suspects involved in drug trafficking must be understood in the context of the case law from which this observation derives. It is well-established law that "the fact that there is probable cause to believe that a person has committed a crime does not automatically give the police probable cause to search his house for evidence of that crime." *Freeman*, 685 F.2d at 949. However, certain types of criminal activity, or the facts of a specific case, may allow officers to make normal inferences that certain evidence would be in the suspect's residence. *See United States v. Pace*, 955 F.2d 270, 277 (5th Cir. 1992) ("The expectation of finding evidence of the crime at the suspect's home, *given that such evidence was not found at the scene of the illegal activity*, was a reasonable inference which supported the magistrate's determination of probable cause to search the residence."); *see also United States v. Laury*, 985 F.2d 1293, 1314 (5th Cir. 1993) (concluding normal inferences established a nexus between the evidence of a bank robbery and the suspect's home when "[t]he instrumentalities and evidence of the crime were not found at the scene of the crime"). The important consideration about these normal inferences, however, is that these inferences are only "normal" to the extent that they depend upon the specific facts of the criminal activity alleged in the affidavit. Allowing a *per se* inference to establish the nexus to the suspect's

12

residence in all cases where drug-trafficking activity occurs would extinguish the distinction between arrest and search warrants. *See Freeman*, 685 F.2d at 949 ("[T]he fact that there is probable cause to believe that a person has committed a crime does not automatically give the police probable cause to search his house for evidence of that crime. 'If that were so, there would be no reason to distinguish search warrants from arrest warrants . . . .'" (quoting *United States v. Lucarz*, 430 F.2d 1051, 1055 (9th Cir. 1970))); *see also Brown*, 567 F. App'x at 282 ("Moreover, the affidavit provided no information linking the drug-trafficking investigation to [the defendant's] residence. . . . [The affiant–officer] did not present any evidence, either direct or inferential, linking the investigation to [the defendant's] home.").

Recognizing the importance of a "normal inference" in establishing a nexus between a suspect's criminal activity and the suspect's residence, the general observation in *Fields* makes sense because the facts of *Fields* (and the cases upon which *Fields* derives its observation) provided the basis for a normal inference that the suspect's residence would have evidence of the suspected criminal activity. More specifically, the suspects in *Fields* and other similar cases were significantly involved in extensive drug-trafficking activities. *See Fields*, 380 F. App'x at 403–04 (explaining that the affidavit recited how the defendant had been "recently indicted . . . on various drugs and weapons charges" prior to the drafting of the affidavit, and that the affiant–officer could make a normal inference that "*jurisdiction-fleeing, gun-toting* drug dealers keep evidence of crime in their homes" (emphasis added)); *Pofahl*, 990 F.2d at 1463, 1475–

77 (explaining how certain facts in the affidavit indicated that the defendant operated the drug-trafficking enterprise out of a prior residence, continued to operate to some extent out of her new residence, and that an officer observed the defendant "carrying 10,000 MDMA tablets" at one point as part of "an elaborate conspiracy for the purpose of trafficking in MDMA"); *Kleinebreil*, 966 F.2d at 947–49 (detailing a case where police recovered 100 pounds of marijuana as part of a "marijuana organization" transporting marijuana between Austin and Atlanta and how these facts "clearly show[ed] a long-standing, ongoing pattern of criminal activity" (quoting *United States v. Craig*, 861 F.2d 818, 822 (5th Cir. 1988))); *Webster*, 960 F.2d at 1307 (detailing how the defendant conducted at least some sales at his own residence and that the affidavit properly alleged the defendant's "overall drug trafficking and sales activity" as a basis for the nexus to his residence). Therefore, the normal inference for an affiant–officer in cases where a suspect is extensively involved in a large drug-trafficking operation would be that some evidence related to the drug-trafficking operation would be at the suspect's house.

The facts in the instant case do not provide for the same "normal inference" because the facts of the affidavit describe three sales for small amounts of methamphetamine with the same undercover officer over a span of approximately four months. According to the affidavit, the investigation did not produce any facts that would suggest Bell was a part of a larger trafficking network. The salient facts of the affidavit were that Bell sold small amounts of methamphetamine and spent a short

amount of time in the Laureland Residence. Even if Detective Kelly safely assumed in the affidavit that the Laureland Residence was in fact Bell's residence, an issue the Court will address further below, the level of drug trafficking by Bell, as described in the affidavit, does not provide the basis for a normal inference that more evidence of Bell's drug trafficking would be at his residence.

The Court does not attempt to pinpoint the level or nature of drug trafficking necessary to provide the basis for a normal inference that drug-trafficking evidence would be in the suspect's residence, but the Court finds that Bell's drug trafficking does not rise to such a level. The Court notes that Bell's drug trafficking presents a factual scenario more akin to the situation presented in *Brown*. In *Brown*, the Fifth Circuit refused to find a nexus between the defendant's possession of a small amount of drugs during a traffic stop and the defendant's residence. *Brown*, 567 F. App'x at 282–83. Despite the fact that the police were investigating the defendant for drug trafficking, the discovery of a small amount of drugs did not provide "any evidence, either direct or inferential, linking the investigation to [the defendant's] home." *Id.* at 282. Although in the instant case the affidavit detailed three drug transactions conducted by Bell, the transactions (1) were only ever with one person (Detective Kelly), (2) were for amounts never exceeding seven grams, and (3) never occurred in the immediate vicinity of the Laureland Residence. In fact, Detective Kelly admitted during the hearing that the statements in the affidavit that he believed certain drug-trafficking evidence would be in the Laureland Residence were based solely on his general experience and not because

of something specific to Bell. Hearing Tr. 43–44 (Doc. No. 160). The affidavit certainly alleges that Bell sold methamphetamine; however, it does not allege the level or nature of drug trafficking that would provide the basis for a normal inference that drug-trafficking evidence would be at the Laureland Residence. A contrary conclusion would risk destroying the requirement that an affidavit establish a nexus between the residence to be searched and the desired evidence, and instead allow officers free reign to search a suspect's residence so long as the officers could establish *any* involvement in drug trafficking. The Court refuses to adopt a rule that would undermine the requirement that a "nexus . . . be established through direct observation or through '*normal inferences* as to where the articles sought would be located.'" *Payne*, 341 F.3d at 400 (emphasis added) (quoting *Freeman*, 685 F.2d at 949).

In addition to this drug-trafficking nexus issue, the Court notes that Detective Kelly's affidavit failed to allege sufficient facts regarding Bell's connection to the Laureland Residence. In other words, the affidavit did not contain sufficient facts to allow for a normal inference that the Laureland Residence was in fact Bell's residence.

In explaining bare-bones affidavits, the Fifth Circuit in *Brown* explained that the affiant "did not present any evidence, either direct or inferential, linking the investigation to [the defendant's] home." *Brown*, 567 F. App'x at 282. The officer's statement in the affidavit that "[i]t is also believed that additional narcotics and paraphernalia are located at [the defendant's] residence" was a "bare-bones statement[]" that did not invoke the good-faith exception. *Id.* at 282–83.

16

In Bell's case, the "bare-bones statements" are the statements asserting that the Laureland Residence was in fact Bell's residence. Detective Kelly asserts that the Laureland Residence was Bell's "last known address" based upon "police arrest records." Beyond this assertion, without any further explanation about these "police arrest records," Detective Kelly makes conclusory references to the Laureland Residence as Bell's residence throughout the rest of the affidavit. The only non-conclusory facts about the Laureland Residence in the affidavit fail to provide the basis for a normal inference that the Laureland Residence was in fact Bell's residence. Officers surveilled the Laureland Residence for part of one day, and in their surveillance, the officers only observed Bell arrive and depart from the Laureland Residence after a brief, 55-minute stay. The affidavit provides no other facts that would suggest Bell was residing at the Laureland Residence because, based solely on the officers' surveillance as alleged in the affidavit, the officers in fact spent more time at the location of the Laureland Residence than did Bell. The affidavit does not recount any other facts that would lead to an inference that Bell resided at the Laureland Residence. Although the Court does not attempt to provide an exhaustive list of facts that might indicate that Bell resided at the Laureland Residence, the Court lists some facts that could have led the officers to such a reasonable inference. For example, Bell could have changed clothes while he was in the Laureland Residence for 55 minutes. Or Bell could have brought certain items in or out of the Laureland Residence with him. Furthermore, if the officers had surveilled the Laureland Residence overnight, or

over a duration of days, then an observation that the same cars were *consistently* at the Laureland Residence might provide the basis for an inference that the Laureland Residence was Bell's residence.

Whereas the affidavit in *Brown* failed to establish a "nexus" between the drug-trafficking investigation and the defendant's home, the affidavit in this case fails to establish a "nexus" between the drug-trafficking investigation of Bell and the Laureland Residence. *See id.* at 282. In his affidavit, Detective Kelly "did not present any evidence, either direct or inferential, linking the investigation to" the Laureland Residence. *Id.* Instead, Detective Kelly makes the conclusory allegation that the Laureland Residence was Bell's residence, relying solely upon the brief, unexplained reference to "police arrest records." *See United States v. Clark*, 638 F.3d 89, 97–99, 104 (2d Cir. 2011) (explaining how allegations in an affidavit that the defendant "controlled" an entire building were conclusory and did not provide the magistrate reviewing the search warrant application sufficient information to determine whether the scope of the warrant was appropriate). Although evidence presented at the suppression hearing is irrelevant to the Court's analysis of the warrant in this case, the Court finds it telling that Detective Kelly "still failed to testify as to a nexus" between the drug-trafficking investigation and the Laureland Residence at the hearing. *See Brown*, 567 F. App'x at 282 n.7. In fact, Detective Kelly admitted during his testimony that there were no observations by the surveilling officers that would indicate that the Laureland Residence served as a trap house. *See id.* (noting that the hearing testimony also failed

to establish a "nexus" in light of the fact that the affiant–officer had no information that would provide "any indication that [the defendant] used his house as a base to store and package drugs"). Detective Kelly also admitted that Bell's recently issued driver's license listed another address as Bell's residence. Hearing Tr. 36–37. As Detective Kelly summarized during cross-examination at the hearing, the extent of the evidence linking the Laureland Residence to the drug-trafficking investigation for Bell was that Bell "[a]rrived there and departed from there." Hearing Tr. 47–49.

Further investigation, or even more factual allegations in the affidavit, may have provided sufficient indicia of probable cause for good-faith exception purposes; however, as the affidavit stands, it was insufficient to allow for the officers who executed it to rely upon it in good faith. *See Brown*, 567 F. App'x at 283 ("Probable cause must be established in the affidavit and evidence presented to the magistrate . . . .").

### B. Probable Cause Did Not Exist for the Warrant Because the Only Basis for the Warrant Was the Affidavit.

Finding that the good-faith exception does not apply, the Court now turns to the second step of the test: "whether the warrant was supported by probable cause." *Rojas Alvarez*, 451 F.3d at 329–30 (quoting *Gibbs*, 421 F.3d at 355). "Probable cause must be established in the affidavit and evidence presented to the magistrate; an 'otherwise insufficient affidavit cannot be rehabilitated by testimony concerning information possessed by the affiant when he sought the warrant but not disclosed to

the issuing magistrate.'" *Brown*, 567 F. App'x at 283 (quoting *Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 565 n.8 (1971)). Important to the facts of this case, probable cause means there must be "a fair probability that contraband or evidence of a crime will be found *in a particular place*." *Gates*, 462 U.S. at 238 (emphasis added). While the affidavit in this case certainly alleged sufficient facts regarding Bell's suspected drug trafficking, it failed to allege sufficient facts to "provide the magistrate with the substantial basis . . . to conclude that there was probable cause" to search the Laureland Residence. *See Brown*, 567 F. App'x at 283–84 ("Moreover, [the affiant– officer] provided no specific facts that would allow the magistrate to conclude that there was a fair probability that drugs would be found in [the defendant's] residence. The affidavit contained no facts regarding the residence itself."). The affidavit in this case only included bare-bones assertions on the issue of whether the Laureland Residence was in fact Bell's residence or connected to Bell's drug trafficking. Furthermore, Detective Kelly did not testify that he presented Judge McDowell, who signed the warrant, with any additional evidence that might support a probable cause determination. *See United States v. Jackson*, 818 F.2d 345, 350 (5th Cir. 1987) ("[The Fifth Circuit's] review is limited to the affidavit itself because the government presented no evidence to the district court to indicate whether other facts may have been before the magistrate and considered by him in his determination of probable cause."). Consequently, probable cause did not support the issued warrant, and the executed search at the Laureland Residence violated the Fourth Amendment.

**IV.    The Court Grants the Motion Because the Good-Faith Exception Does Not Apply and Probable Cause for the Search Did Not Exist.**

The good-faith exception does not apply to the search conducted pursuant to the challenged warrant in this case because the affidavit was so lacking in indicia of probable cause concerning the nexus between Bell's drug trafficking and the Laureland Residence. The search warrant also lacked probable cause because: (1) the affidavit was "so lacking in indicia of probable cause" and (2) the Government presented no evidence to the Court to indicate that other facts may have been presented to and considered by Judge McDowell in his determination that there was probable cause to search the Laureland Residence. Consequently, the Court **GRANTS** the Motion. All evidence recovered from the search of the Laureland Residence pursuant to the challenged warrant shall be inadmissible at trial.

**SO ORDERED.**

Signed May 9th, 2019.

_Ed Kinkeade_

ED KINKEADE
UNITED STATES DISTRICT JUDGE